UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |  |
|---|---|---|
| FREDDY GIVENS, JR., | : | |
| Plaintiff, | : | 13 Civ. 4763 (VEC) (AJP) |
| -against- | : | **REPORT AND RECOMMENDATION** **(CORRECTED)** |
| CAROLYN W. COLVIN, Commissioner of Social Security, | : | |
| | : | |
| Defendant. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**ANDREW J. PECK, United States Magistrate Judge:**

**To the Honorable Valerie E. Caproni, United States District Judge:**

Pro se plaintiff Freddy Givens brings this action pursuant to § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), challenging the final decision of the Commissioner of Social Security (the "Commissioner") denying him Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") benefits.  (Dkt. No. 2: Compl.)  Presently before the Court is the Commissioner's motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c).  (Dkt. No. 15: Notice of Motion.)[1]

For the reasons set forth below, the Commissioner's motion for judgment on the pleadings (Dkt. No. 15) should be GRANTED.

---

[1]     Givens' response to the Commissioner's motion was to submit documents showing medical appointments in 2014.  (Dkt. Nos. 18-19.)  They are not relevant to the time period at issue before the Court.  Of course, if Givens' vision has deteriorated in 2014, he may be able to file a new DIB/SSI application.

# FACTS

## Procedural Background

On June 22, 2010, Givens applied for SSI and DIB benefits, alleging that he was disabled since June 10, 2010.  (Dkt. No. 12: Administrative Record filed by the Comm'r ("R.") 50-51, 134-39.)  Givens alleged disability due to an infection in the left eye and pain in his right eye.  (R. 42, 56-57.)  The Social Security Administration ("SSA") found that Givens was not disabled, and denied the application.  (R. 52-57.)  Givens requested an administrative hearing.  (R. 58-61.)

Administrative Law Judge ("ALJ") Curtis Axelsen conducted an initial hearing on June 15, 2011, at which Givens was represented by counsel.  (R. 36-49.)  On November 16, 2011, Givens, his attorney and a vocational expert appeared at an additional hearing before ALJ Axelsen.  (R. 20-35.)  On January 13, 2012, ALJ Axelsen issued a written decision finding Givens not disabled.  (R. 7-16.)  ALJ Axelsen's decision became the Commissioner's final decision when the Appeals Council denied Givens' request for review on June 28, 2013.  (R. 1-4.)

The issue before the Court is whether the Commissioner's decision finding that Givens is not disabled is supported by substantial evidence.

## Non-Medical Evidence

Givens, born on January 18, 1965, was forty-five years old at the alleged onset of his disability.  (R. 26, 50, 134.)  He left high school in eleventh grade and received a general equivalency diploma ("GED").  (R. 26.)  He worked as a messenger for a delivery service from 1990 until June 14, 2010.  (R. 156-57, 174-82, 193.)  While working as a delivery messenger, a pebble injured Givens' left eye, which subsequently was surgically removed.  (R. 40-42, 165, 172.)  He

applied for Workers' Compensation, but had not received a response as of June 15, 2011.  (R. 40.) His work as a messenger required him to lift and carry 5-10 pounds, and walk and ride a bicycle 8-9 hours a day.  (R. 176-81.)

Givens lived in a shelter until November 2011.  (R. 165.)[2] The shelter prepared his meals, and he did no house or yard work.  (R. 167-68.)  On a typical day at the shelter, Givens would eat breakfast, watch television and walk around.  (R. 44.)  He sometimes visited his brother-in-law's house and returned to the shelter for dinner.  (R. 44-45.)  Givens had no problems getting along with friends and family.  (R. 170.)  He went to church regularly; his hobbies included working with cable satellites and high definition converters, and deejaying, but he did these things infrequently.  (R. 169-70.)

Givens only has use of his right eye, which he testified is strained and very painful. (R. 42.)  He uses sunglasses and prescription eye drops that help stop the strain and pain; after using them he rests by closing his eye and laying down.  (R. 42, 45, 171.)  Givens stated that he has trouble remembering things and sometimes has problems paying attention, but he can follow spoken and written instructions.  (R. 171-72.)  Givens can read, write and watch television, but his vision sometimes becomes blurry.  (R. 25, 31, 46.)  He experiences stress due to his condition.  (R. 172.)

Givens takes care of his personal needs and grooming without help or reminders, but it is a slow process due to his visual impairment.  (R. 166-67.)  He knows how to fix his own meals and has no problems seeing with his right eye when cooking.  (R. 32, 167.)  He takes public transportation and can take long walks with a friend.  (R. 168, 171.)

---

[2]     Givens reported that as of November 11, 2011, he had moved out of the shelter into an apartment located at 497 East 156th Street, Bronx, New York 10455.  (R. 127.)

Givens testified that his past work as a messenger required good vision because he had to read documents and delivery locations.  (R. 46-47.)  At the June 15, 2011 hearing, Givens testified that he would not accept his previous messenger job if it were offered because he does not feel that he should have to work anymore.  (R. 48.)  He stated that he had been a "good worker" for twenty-four years as a messenger and that now he should "sit back and relax, and collect some time in Social Security."  (R. 47-48.)  At the November 16, 2011 hearing, Givens testified that he could no longer work as a messenger because he felt that he "did 25 years of messenger work and [he] think[s he] had enough of doing it, since [he] lost [his] left eye."  (R. 25.)  Givens also testified that his eye condition and eye pain prevent him from working.  (R. 48.)

Givens stated that he experiences constant headaches.  (R. 23, 187.)  His alleged "[o]ff and on" headaches occur approximately four to five times a week, lasting two to three hours at a time.  (R. 23.)  When he has a headache, he takes Tramadol, which helps his pain.  (R. 23-24.)  He receives no ongoing treatment for his headaches other than the Tramadol.  (R. 24.)  Givens testified that in a normal work month of twenty days, his headaches would prevent him from going to work fourteen or fifteen days.  (R. 30.)  ALJ Axelsen left the record open for thirty days following the November 16, 2011 hearing, so that Givens' attorney could seek additional medical evidence about Givens' headaches.  (R. 24, 33-34.)  No such evidence was provided.

**Medical Evidence**

**Bellevue 2010**

On May 28, 2010, Givens was admitted to Bellevue Hospital for treatment of a left eye pseudomonal corneal ulcer or hypopyon ulcer.  (R. 198-204, 208-11.)  Givens reported that a pebble hit his eye while he was making a delivery on his bicycle; he also may have scratched his eye

at the shelter where he lived.  (R. 208.)  Givens complained of pain and itching in his left eye, with edema, decreased vision and increased watery discharge.  (R. 208.)  Prior to treatment completion, Givens left Bellevue against medical advice because he did not want to lose either his room at the shelter or his job.  (R. 203, 208.)  His symptoms worsened and he returned on June 1, 2010 for treatment of pan-endophthalmitis, perforated globe and orbital cellulitis.  (R. 203-04, 208-11, 225-26, 241-56.)  On June 10, 2010, Givens' left eye was surgically removed and replaced with an implant, conformer and temporary tarsorrhaphy.  (R. 203-04, 208-11.)  Givens was discharged on June 11, 2010 with prescriptions for monocycline and Cipro, as well as Tylenol with codeine for breakthrough pain.  (R. 208.)  He was told to return to the oculoplastic clinic for follow-up on June 14, 2010.  (R. 208.)

Givens returned to Bellevue on June 14, 2010 with no complaints of pain.  (R. 207.) The clinic prescribed Cipro and Vigamox for his left eye socket.  (R. 207.)  Visual acuity in his right eye was 20/20.  (R. 207.)

Givens returned to Bellevue on June 21, 2010 for a follow-up and the Bellevue staff noted that he was doing well.  (R. 206.)  Vigamox was continued and Cipro was discontinued.  (R. 206.)  Visual acuity in his right eye remained 20/20.  (R. 206.)  Givens was instructed to return in two weeks, at which time he would be referred to an ocularist.  (R. 206.)

On July 12, 2010, Givens returned to Bellevue for a follow-up and was again noted to be doing well.  (R. 196, 205.)  His conformer was replaced and he was advised to return if his conformer fell out again.  (R. 205.)  He was instructed to continue using Vigamox in his left eye, and to follow up with an ocularist in three weeks and an opthalmologist in two months.  (R. 205.)

### Consultative Physician Dr. Gene Matusow

On July 22, 2010, at the Commissioner's request, Dr. Gene Matusow performed a consultative opthalmologic examination.  (R. 212-14.)  Givens complained of blurred vision.  (R. 212.)  He currently had not been fitted with a prosthesis.  (R. 212.)  On physical examination, uncorrected visual acuity was 20/200 in the right eye, best corrected visual acuity was 20/30 in the right eye and there was no light perception in the left eye.  (R. 212-13.)  Dr. Matusow diagramed the field of vision for Givens' right eye, indicating a visual field of approximately three of four quadrants.  (R. 214.)[3/]  Examination revealed the right eye to be white and quiet, and the left orbit was anopthalmic, with no prosthesis.  (R. 213.)  In the right eye, the fundus could only be seen in poor detail due to profound miosis, the cornea, lens and vitreous body were clear, and the anterior chamber was deep and clear.  (R. 213.)  Dr. Matusow concluded that Givens had a "permanent visual disability as a result of blindness in the left eye secondary to recent trauma."  (R. 213, 220.)

### Bellevue 2010 Through 2011

Givens returned to Bellevue for a follow-up on October 25, 2010.  (R. 231.)  The typed treatment note indicated that Givens reported "no pain issues at this time," but the word "no" was crossed out and "The right eye hurt's [sic] and I'm in pain" was written by hand, presumably by Givens.  (R. 231.)  Givens' wound was clean and intact.  (R. 231.)  He had not yet been to the ocularist, and he was reminded to make an appointment for a prosthetic.  (R. 231.)  He was instructed to return in six months, or sooner if needed.  (R. 231.)

---

[3/]     In a July 30, 2010 report of contact by State agency analyst J. Callagher, Dr. Matusow stated that there was a typo in the narrative portion of his report.  (R. 183.)  Dr. Matusow stated that the visual field in Givens' right eye was abnormal, as Givens was not able to see in the inferior temporal quadrant, but the remainder of the visual field in the right eye was normal.  (R. 183; see also R. 218-20.)

On February 9, 2011, Givens returned to Bellevue for a routine follow-up. (R. 230.) Visual acuity in Givens' right eye was 20/60, and 20/40 with pinhole. (R. 230.) Givens was instructed to return in four months for a dilated fundus examination. (R. 230.)

On May 2, 2011, Givens returned to Bellevue for a follow-up. (R. 260.) Givens was not interested in a prosthetic eye due to the cost. (R. 260.) Vision in Givens' right eye was 20/40. (R. 260.) He was instructed to return in six months. (R. 260.)

In a May 5, 2011 letter, Dr. Owen R. Kieran of Bellevue wrote that Givens underwent "evisceration (removal) of the left eye in June 2010," and was "blind in that eye." (R. 259.) Dr. Kieran stated that Givens' right eye had 20/40 vision. (R. 259.)

**Lenox Hill Hospital**

On May 24, 2011, Givens presented to the Lenox Hill Hospital emergency department complaining of right eye pain. (R. 261-66, 268.) The diagnosis was right eye pain. (R. 261.) The cause of his eye pain was not considered dangerous, and Givens was advised that he could treat his symptoms with pain medications. (R. 268.) Givens was discharged in stable condition and referred to the Manhattan Eye, Ear & Throat Institute eye clinic for follow-up re-evaluation and treatment. (R. 261.)

Givens returned to Lenox Hill on September 14, 2011 via public transportation and without accompaniment. (R. 269-77.) He complained of right eye pain for the past week. (R. 269-71.) He described the pain as constant "blurring," which began gradually. (R. 269.) Givens said the pain was a seven on the numeric pain rating scale, and reported tearing but denied decreased vision, dizziness, headache or other complaints. (R. 269-72.) He stated that he had been straining his right eye, and he used Refresh artificial tears with some relief. (R. 271.) Right eye pupil pin

point was noted.  (R. 273.)  Givens had no complaints with regard to his removed left eye.  (R. 271.)  He stated that he needed a medical report for a law suit.  (R. 273.)

On examination, Givens' right eye extraocular muscles were intact, and conjuctiva and sclera were clear.  (R. 272.)  Right eye visual acuity was 20/25 corrected and uncorrected, and he was able to read.  (R. 270-71.)  There was no discharge.  (R. 272.)  The diagnosis was eye pain.  (R. 273.)  Givens was discharged in stable condition and unaccompanied.  (R. 273.)  He was referred to Bellevue's eye clinic, or to the Manhattan Eye, Ear & Throat Institute eye clinic for examination and further treatment.  (R. 273.)

On September 23, 2011, Givens returned to Lenox Hill, arriving unaccompanied and walking from home.  (R. 278-82.)  He complained of right eye pain for the past two days due to eye strain.  (R. 278-79.)  He described the pain as a ten on the numeric pain rating scale, and he requested pain medications.  (R. 278-79.)  He denied decreased vision, headache or other complaints.  (R. 279-80.)  Examination of Givens' right eye was within normal limits, revealing pupil pin point, intact extraocular muscles, clear conjunctiva and sclera and no change in vision.  (R. 280-81.)  The assessment was right eye pain secondary to strain, and Givens was prescribed Tramadol as needed for pain.  (R. 280-82.)  He was discharged to his home in stable condition, with instructions to follow-up at Lenox Hill in three days.  (R. 281.)

**Vocational Expert Testimony**

Vocational expert Pat Green testified at Givens' November 16, 2011 hearing.  (R. 25-33, 124-25.)  Green testified that Givens had worked as a "deliverer outside," which was unskilled work at a light level.  (R. 27.)  ALJ Axelsen asked Green to discuss jobs for a hypothetical individual of Givens' age, education and work experience, who had the residual functional capacity

("RFC") to perform light and sedentary work, and who had 20/30 or 20/40[4] vision in one eye, and no vision in the other eye.  (R. 27-32.)  Green responded that such a hypothetical individual would be unable to perform Givens' past work as a deliverer.  (R. 27-28.)  Green testified that such a hypothetical individual could perform the work of a hand packager, which was unskilled, light exertion work and totaled 318,000 positions nationally and 3,000 positions regionally.  (R. 29.)  A second job was garment sorter, unskilled, sedentary, with 128,000 positions nationally and 3,200 positions regionally.  (R. 30.)  A third job was sorter, unskilled, sedentary, with 33,000 positions nationally and 2,000 positions regionally.  (R. 30.)  A fourth job was stuffer, unskilled, sedentary, with 200,000 positions nationally and 2,200 positions regionally.  (R. 30.)  Green explained that if the individual had significant eye strain that required him to take a break of at least one to two hours during a normal eight-hour work day, or miss more than three or four work-days a month, the individual would not be able to perform any of those jobs.  (R. 29-31.)

**ALJ Axelsen's Decision**

On January 13, 2012, ALJ Axelsen issued a written decision denying Givens' application for DIB and SSI benefits.  (R. 7-16.)

ALJ Axelsen conducted a five-step analysis, considering Givens' testimony and the medical record.  (R. 11-15.)  First, ALJ Axelsen found that Givens had not engaged in substantial gainful activity since June 10, 2010, the alleged onset date.  (R. 12.)  Second, he determined that Givens had the severe impairment of loss of vision in his left eye.  (R. 12-13.)  ALJ Axelsen determined that Givens' alleged headaches were not a medically determinable impairment.  (R. 13.)

---

[4]   Green testified that Givens' visual acuity in the right eye was 20/40 but subsequently clarified that it was 20/30.  (R. 27-28.)

Third, ALJ Axelsen found that Givens did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.  (R. 13.)  ALJ Axelsen determined that Givens retained the residual functional capacity to perform light work, except work requiring use of sight in more than one eye.  (R. 13-14.)

ALJ Axelsen made a credibility determination about Givens' subjective pain allegations, finding that Givens' "statements concerning the intensity, persistence and limiting effects of [his] symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment."  (R. 14.)  He noted that the objective medical evidence was insufficient to show that Givens would require extensive work breaks.  (R. 14.)  Moreover, ALJ Axelsen noted that Givens testified on two separate occasions that he worked his whole life and "now feels entitled to collect benefits."  (R. 14.)

ALJ Axelsen gave "great weight" to the findings of the treating physicians at Bellevue because "their extended treatment and observation of [Givens] allows a more insightful and detailed, longitudinal picture of [his] medical impairment."  (R. 14.)  The Bellevue physicians found that Givens had "an evisceration of the left eye in June 2010 and is blind in that eye.  [His] right eye ha[d] 20/40 vision."  (R. 14.)  ALJ Axelsen also gave "substantial weight" to the findings of consultative examiner Dr. Matusow because "they are consistent with the medical record of evidence."  (R. 14.)  Dr. Matusow found that Givens "had permanent blindness in the left eye secondary to trauma" and "visual acuity corrected to 20/30 in the right eye with normal visual field." (R. 14.)  ALJ Axelsen also assigned great weight to the findings of the treating physicians at Lenox Hill Hospital because of "their treating relationship" with Givens.  (R. 14.)  The Lenox Hill records indicate that "on September 23, 2011 . . . [Givens] complained of right eye pain lasting 2 days," that

Givens' eye pain "did not involve decrease in vision," that he experienced "no dizziness, no headache, and no other complaints and [Givens] was discharged home," and notably, that Givens "stated that he needed a medical report for a lawsuit."  (R. 14.)

At the fourth step, ALJ Axelsen determined that Givens was "unable to perform any past relevant work."  (R. 14.)  At the fifth and last step, ALJ Axelsen found that, "[c]onsidering [Givens'] age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [Givens] can perform," based on the vocational expert's testimony.  (R. 15.)  ALJ Axelsen concluded that Givens was not "under a disability, as defined in the Social Security Act, from June 10, 2010, through the date of [the] decision," January 13, 2012.  (R. 15-16.)

On June 28, 2013, the Appeals Council denied Givens' request for review of ALJ Axelsen's decision and it became the Commissioner's final decision.  (R. 1-4.)

## ANALYSIS

## I.   THE APPLICABLE LAW

### A.   Definition Of Disability

A person is considered disabled for Social Security benefits purposes when he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); see, e.g., Barnhart v. Thomas, 540 U.S. 20, 23, 124 S. Ct. 376, 379 (2003); Barnhart

v. <u>Walton</u>, 535 U.S. 212, 214, 122 S. Ct. 1265, 1268 (2002); <u>Impala</u> v. <u>Astrue</u>, 477 F. App'x 856, 857 (2d Cir. 2012).[5/]

> An individual shall be determined to be under a disability only if [the combined effects of] his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §§ 423(d)(2)(A)-(B), 1382c(a)(3)(B), (G); <u>see</u>, <u>e.g.</u>, <u>Barnhart</u> v. <u>Thomas</u>, 540 U.S. at 23, 124 S. Ct. at 379; <u>Barnhart</u> v. <u>Walton</u>, 535 U.S. at 218, 122 S. Ct. at 1270; <u>Salmini</u> v. <u>Comm'r of Soc. Sec.</u>, 371 F. App'x at 111; <u>Betances</u> v. <u>Comm'r of Soc. Sec.</u>, 206 F. App'x at 26; <u>Butts</u> v. <u>Barnhart</u>, 388 F.3d at 383; <u>Draegert</u> v. <u>Barnhart</u>, 311 F.3d at 472.[6/]

In determining whether an individual is disabled for disability benefit purposes, the Commissioner must consider: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or

---

[5/]     <u>See also</u>, <u>e.g.</u>, <u>Salmini</u> v. <u>Comm'r of Soc. Sec.</u>, 371 F. App'x 109, 111 (2d Cir. 2010); <u>Betances</u> v. <u>Comm'r of Soc. Sec.</u>, 206 F. App'x 25, 26 (2d Cir. 2006); <u>Surgeon</u> v. <u>Comm'r of Soc. Sec.</u>, 190 F. App'x 37, 39 (2d Cir. 2006); <u>Rodriguez</u> v. <u>Barnhart</u>, 163 F. App'x 15, 16 (2d Cir. 2005); <u>Malone</u> v. <u>Barnhart</u>, 132 F. App'x 940, 941 (2d Cir. 2005); <u>Butts</u> v. <u>Barnhart</u>, 388 F.3d 377, 383 (2d Cir. 2004), <u>amended on other grounds</u>, 416 F.3d 101 (2d Cir. 2005); <u>Green-Younger</u> v. <u>Barnhart</u>, 335 F.3d 99, 106 (2d Cir. 2003); <u>Veino</u> v. <u>Barnhart</u>, 312 F.3d 578, 586 (2d Cir. 2002); <u>Draegert</u> v. <u>Barnhart</u>, 311 F.3d 468, 472 (2d Cir. 2002); <u>Shaw</u> v. <u>Chater</u>, 221 F.3d 126, 131 (2d Cir. 2000); <u>Brown</u> v. <u>Apfel</u>, 174 F.3d 59, 62 (2d Cir. 1999); <u>Rosa</u> v. <u>Callahan</u>, 168 F.3d 72, 77 (2d Cir. 1999); <u>Tejada</u> v. <u>Apfel</u>, 167 F.3d 770, 773 (2d Cir. 1999); <u>Balsamo</u> v. <u>Chater</u>, 142 F.3d 75, 79 (2d Cir. 1998); <u>Perez</u> v. <u>Chater</u>, 77 F.3d 41, 46 (2d Cir. 1996).

[6/]     <u>See also</u>, <u>e.g.</u>, <u>Shaw</u> v. <u>Chater</u>, 221 F.3d at 131-32; <u>Rosa</u> v. <u>Callahan</u>, 168 F.3d at 77; <u>Balsamo</u> v. <u>Chater</u>, 142 F.3d at 79.

others; and (4) the claimant's educational background, age, and work experience." <u>Mongeur</u> v.

<u>Heckler</u>, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam).[7/]

### B.   Standard Of Review

A court's review of the Commissioner's final decision is limited to determining

whether there is "substantial evidence" in the record as a whole to support such determination.  <u>E.g.</u>,

42 U.S.C. § 405(g); <u>Giunta</u> v. <u>Comm'r of Soc. Sec.</u>, 440 F. App'x 53, 53 (2d Cir. 2011); <u>Green-</u>

<u>Younger</u> v. <u>Barnhart</u>, 335 F.3d 99, 105-06 (2d Cir. 2003).[8/]   "'Thus, the role of the district court is

quite limited and substantial deference is to be afforded the Commissioner's decision.'"  <u>Morris</u> v.

<u>Barnhart</u>, 02 Civ. 0377, 2002 WL 1733804 at *4 (S.D.N.Y. July 26, 2002) (Peck, M.J.).[9/]

---

[7/]   <u>See</u>, <u>e.g.</u>, <u>Brunson</u> v. <u>Callahan</u>, No. 98-6229, 199 F.3d 1321 (table), 1999 WL 1012761 at *1 (2d Cir. Oct. 14, 1999); <u>Brown</u> v. <u>Apfel</u>, 174 F.3d at 62; <u>Carroll</u> v. <u>Sec'y of Health & Human Servs.</u>, 705 F.2d 638, 642 (2d Cir. 1983).

[8/]   <u>See also</u>, <u>e.g.</u>, <u>Prince</u> v. <u>Astrue</u>, 514 F. App'x 18, 19 (2d Cir. 2013); <u>Salmini</u> v. <u>Comm'r of Soc. Sec.</u>, 371 F. App'x 109, 111 (2d Cir. 2010); <u>Acierno</u> v. <u>Barnhart</u>, 475 F.3d 77, 80-81 (2d Cir.), <u>cert. denied</u>, 551 U.S. 1132, 127 S. Ct. 2981 (2007); <u>Halloran</u> v. <u>Barnhart</u>, 362 F.3d 28, 31 (2d Cir. 2004); <u>Jasinski</u> v. <u>Barnhart</u>, 341 F.3d 182, 184 (2d Cir. 2003); <u>Veino</u> v. <u>Barnhart</u>, 312 F.3d 578, 586 (2d Cir. 2002); <u>Shaw</u> v. <u>Chater</u>, 221 F.3d 126, 131 (2d Cir. 2000); <u>Brown</u> v. <u>Apfel</u>, 174 F.3d 59, 61 (2d Cir. 1999); <u>Rosa</u> v. <u>Callahan</u>, 168 F.3d 72, 77 (2d Cir. 1999); <u>Tejada</u> v. <u>Apfel</u>, 167 F.3d 770, 773 (2d Cir. 1999); <u>Schaal</u> v. <u>Apfel</u>, 134 F.3d 496, 501 (2d Cir. 1998); <u>Perez</u> v. <u>Chater</u>, 77 F.3d 41, 46 (2d Cir. 1996); <u>Rivera</u> v. <u>Sullivan</u>, 923 F.2d 964, 967 (2d Cir. 1991); <u>Mongeur</u> v. <u>Heckler</u>, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam); <u>Dumas</u> v. <u>Schweiker</u>, 712 F.2d 1545, 1550 (2d Cir. 1983).

[9/]   <u>See also</u>, <u>e.g.</u>, <u>Karle</u> v. <u>Astrue</u>, 12 Civ. 3933, 2013 WL 2158474 at *9 (S.D.N.Y. May 17, 2013) (Peck, M.J.), <u>report & rec. adopted</u>, 2013 WL 4779037 (S.D.N.Y. Sept. 6, 2013); <u>Santiago</u> v. <u>Astrue</u>, 11 Civ. 6873, 2012 WL 1899797 *13 (S.D.N.Y. May 24, 2012) (Peck, M.J.); <u>Duran</u> v. <u>Barnhart</u>, 01 Civ. 8307, 2003 WL 103003 at *9 (S.D.N.Y. Jan. 13, 2003); <u>Florencio</u> v. <u>Apfel</u>, 98 Civ. 7248, 1999 WL 1129067 at *5 (S.D.N.Y. Dec. 9, 1999) (Chin, D.J.) ("The Commissioner's decision is to be afforded considerable deference; the reviewing court should not substitute its own judgment for that of the Commissioner, even if it might justifiably have reached a different result upon a de novo review." (quotations & alterations omitted)).

The Supreme Court has defined "substantial evidence" as "'more than a mere scintilla [and] such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" <u>Richardson</u> v. <u>Perales</u>, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971); <u>accord</u>, <u>e.g.</u>, <u>Selian</u> v. <u>Astrue</u>, 708 F.3d 409, 417 (2d Cir. 2013); <u>Rosa</u> v. <u>Callahan</u>, 168 F.3d at 77; <u>Tejada</u> v. <u>Apfel</u>, 167 F.3d at 773-74.[10/]  "[F]actual issues need not have been resolved by the [Commissioner] in accordance with what we conceive to be the preponderance of the evidence." <u>Rutherford</u> v. <u>Schweiker</u>, 685 F.2d 60, 62 (2d Cir. 1982), <u>cert. denied</u>, 459 U.S. 1212, 103 S. Ct. 1207 (1983).  The Court must be careful not to "'substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a <u>de novo</u> review.'" <u>Jones</u> v. <u>Sullivan</u>, 949 F.2d 57, 59 (2d Cir. 1991).[11/]

The Court, however, will not defer to the Commissioner's determination if it is "'the product of legal error.'"  <u>E.g.</u>, <u>Duvergel</u> v. <u>Apfel</u>, 99 Civ. 4614, 2000 WL 328593 at *7 (S.D.N.Y. Mar. 29, 2000) (Peck, M.J.); <u>see also</u>, <u>e.g.</u>, <u>Douglass</u> v. <u>Astrue</u>, 496 F. App'x 154, 156 (2d Cir. 2012); <u>Butts</u> v. <u>Barnhart</u>, 388 F.3d 377, 384 (2d Cir. 2004), <u>amended on other grounds</u>, 416 F.3d 101 (2d Cir. 2005); <u>Tejada</u> v. <u>Apfel</u>, 167 F.3d at 773 (citing cases).

The Commissioner's regulations set forth a five-step sequence to be used in evaluating disability claims.  20 C.F.R. §§ 404.1520, 416.920; <u>see</u>, <u>e.g.</u>, <u>Barnhart</u> v. <u>Thomas</u>, 540

---

[10/]     <u>See also</u>, <u>e.g.</u>, <u>Halloran</u> v. <u>Barnhart</u>, 362 F.3d at 31; <u>Jasinski</u> v. <u>Barnhart</u>, 341 F.3d at 184; <u>Green-Younger</u> v. <u>Barnhart</u>, 335 F.3d at 106; <u>Veino</u> v. <u>Barnhart</u>, 312 F.3d at 586; <u>Shaw</u> v. <u>Chater</u>, 221 F.3d at 131; <u>Curry</u> v. <u>Apfel</u>, 209 F.3d 117, 122 (2d Cir. 2000); <u>Brown</u> v. <u>Apfel</u>, 174 F.3d at 61; <u>Perez</u> v. <u>Chater</u>, 77 F.3d at 46.

[11/]     <u>See also</u>, <u>e.g.</u>, <u>Campbell</u> v. <u>Astrue</u>, 465 F. App'x 4, 6 (2d Cir. 2012); <u>Veino</u> v. <u>Barnhart</u>, 312 F.3d at 586.

U.S. 20, 24-25, 124 S. Ct. 376, 379-80 (2003); <u>Bowen</u> v. <u>Yuckert</u>, 482 U.S. 137, 140, 107 S. Ct.

2287, 2291 (1987).  The Supreme Court has articulated the five steps as follows:

> Acting pursuant to its statutory rulemaking authority, the agency has promulgated regulations establishing a five-step sequential evaluation process to determine disability.  If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further.  [1] At the first step, the agency will find nondisability unless the claimant shows that he is not working at a "substantial gainful activity."  [2] At step two, the SSA will find nondisability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities."  [3] At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies.  [4] If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled.  [5] If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy.

<u>Barnhart</u> v. <u>Thomas</u>, 540 U.S. at 24-25, 124 S. Ct. at 379-80 (fns. & citations omitted); <u>accord</u>, <u>e.g.</u>,

<u>Talavera</u> v. <u>Astrue</u>, 697 F.3d 145, 151 (2d Cir. 2012); <u>Rosa</u> v. <u>Callahan</u>, 168 F.3d at 77; <u>Tejada</u> v.

<u>Apfel</u>, 167 F.3d at 774.[12/]

The claimant bears the burden of proof as to the first four steps; if the claimant meets

the burden of proving that he cannot return to his past work, thereby establishing a prima facie case,

the Commissioner then has the burden of proving the last step, that there is other work the claimant

---

[12/]   <u>See also</u>, <u>e.g.</u>, <u>Jasinski</u> v. <u>Barnhart</u>, 341 F.3d at 183-84; <u>Green-Younger</u> v. <u>Barnhart</u>, 335 F.3d at 106; <u>Shaw</u> v. <u>Chater</u>, 221 F.3d at 132; <u>Brown</u> v. <u>Apfel</u>, 174 F.3d at 62; <u>Balsamo</u> v. <u>Chater</u>, 142 F.3d 75, 79-80 (2d Cir. 1998); <u>Schaal</u> v. <u>Apfel</u>, 134 F.3d at 501; <u>Perez</u> v. <u>Chater</u>, 77 F.3d at 46; <u>Dixon</u> v. <u>Shalala</u>, 54 F.3d 1019, 1022 (2d Cir. 1995); <u>Berry</u> v. <u>Schweiker</u>, 675 F.2d 464, 467 (2d Cir. 1982).

can perform considering not only his medical capacity but also his age, education and training.  See,
e.g., Barnhart v. Thomas, 540 U.S. at 25, 124 S. Ct. at 379-80.[13]

## II.   APPLICATION OF THE FIVE-STEP SEQUENCE TO GIVENS' CLAIM

### A.   Givens Was Not Engaged In Substantial Gainful Activity

The first inquiry is whether Givens was engaged in substantial gainful activity after
his application for SSI benefits.  "Substantial gainful activity" is defined as work that involves
"doing significant and productive physical or mental duties" and "[i]s done (or intended) for pay or
profit."  20 C.F.R. § 404.1510.  Since ALJ Axelsen's conclusion that Givens did not engage in
substantial gainful activity during the applicable time period (see page 9 above) benefits Givens, the
Court proceeds to the second step of the five-step analysis.

### B.   Givens Demonstrated a "Severe" Impairment That Significantly Limited His Ability To Do Basic Work Activities

The second step of the analysis is to determine whether Givens proved that he had
a severe impairment or combination of impairments that "significantly limit[ed his] physical or
mental ability to do basic work activities."  20 C.F.R. § 404.1521(a).  The ability to do basic work
activities is defined as "the abilities and aptitudes necessary to do most jobs."  20 C.F.R. §
404.1521(b).  "Basic work activities" include:

> walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling
> . . . seeing, hearing, and speaking . . . [u]nderstanding, carrying out, and
> remembering simple instructions . . . [u]se of judgment . . . [r]esponding
> appropriately to supervision, co-workers and usual work situations . . . [d]ealing with
> changes in a routine work setting.

---

[13]   See also, e.g., Selian v. Astrue, 708 F.3d at 418; Betances v. Comm'r of Soc. Sec., 206 F.
App'x at 25, 26 (2d Cir. 2006); Green-Younger v. Barnhart, 335 F.3d at 106; Rosa v.
Callahan, 168 F.3d at 80; Perez v. Chater, 77 F.3d at 46; Berry v. Schweiker, 675 F.2d at
467.

20 C.F.R. § 404.1521(b)(1)-(6).  The Second Circuit has warned that the step two analysis may not do more than "screen out de minimis claims."  Dixon v. Shalala, 54 F.3d 1019, 1030 (2d Cir. 1995).  "[T]he 'mere presence of a disease or impairment, or establishing that a person has been diagnosed or treated for a disease or impairment' is not, by itself, sufficient to render a condition 'severe.'"  McDowell v. Colvin, No. 11-CV-1132, 2013 WL 1337152 at *6 (N.D.N.Y. Mar. 11, 2013), report & rec. adopted, 2013 WL 1337131 (N.D.N.Y. Mar. 29, 2013).[14/]

"A finding that a condition is not severe means that the plaintiff is not disabled, and the Administrative Law Judge's inquiry stops at the second level of the five-step sequential evaluation process."  Rosario v. Apfel, No. 97 CV 5759, 1999 WL 294727 at *5 (E.D.N.Y. Mar. 19, 1999).  On the other hand, if the disability claim rises above the de minimis level, then the further analysis of step three and beyond must be undertaken.  See, e.g., Dixon v. Shalala, 54 F.3d at 1030.

"A finding of 'not severe' should be made if the medical evidence establishes only a 'slight abnormality' which would have 'no more than a minimal effect on an individual's ability to work.'"  Rosario v. Apfel, 1999 WL 294727 at *5 (quoting Bowen v. Yuckert, 482 U.S. 137, 154 n.12, 107 S. Ct. 2287, 2298 n.12 (1987)).

---

[14/]   Accord, e.g., Whiting v. Astrue, Civ. Action No. 12-274, 2013 WL 427171 at *2 (N.D.N.Y. Jan. 15, 2013) ("'The mere presence of a disease or impairment alone . . . is insufficient to establish disability; instead, it is the impact of the disease, and in particular any limitations it may impose upon the claimant's ability to perform basic work functions, that is pivotal to the disability inquiry.'"), report & rec. adopted, 2013 WL 427166 (N.D.N.Y. Feb. 4, 2013); Lohnas v. Astrue, No. 09-CV-685, 2011 WL 1260109 at *3 (W.D.N.Y. Mar. 31, 2011), aff'd, 510 F. App'x 13 (2d Cir. 2013); Hahn v. Astrue, 08 Civ. 4261, 2009 WL 1490775 at *7 (S.D.N.Y. May 27, 2009) (Lynch, D.J.) ("[I]t is not sufficient that a plaintiff 'establish[] the mere presence of a disease or impairment.'  Rather, 'the disease or impairment must result in severe functional limitations that prevent the claimant from engaging in any substantial gainful activity.'" (citation omitted)); Rodriguez v. Califano, 431 F. Supp. 421, 423 (S.D.N.Y. 1977) ("The mere presence of a disease or impairment is not disabling within the meaning of the Social Security Act.").

ALJ Axelsen determined that the medical evidence indicated that Givens' blindness in his left eye was a severe impairment.  (See page 9 above.)   ALJ Axelsen's finding regarding Givens' blindness benefits Givens and the Court therefore proceeds to the third step of the five-part analysis.

### C.    Givens Did Not Have A Disability Listed In Appendix 1 Of The Regulations

The third step of the five-step test requires a determination of whether Givens had an impairment listed in Appendix 1 of the Regulations.  20 C.F.R., Pt. 404, Subpt. P, App. 1.  "These are impairments acknowledged by the [Commissioner] to be of sufficient severity to preclude gainful employment.  If a claimant's condition meets or equals the 'listed' impairments, he or she is conclusively presumed to be disabled and entitled to benefits."  Dixon v. Shalala, 54 F.3d 1019, 1022 (2d Cir. 1995).

ALJ Axelsen found that Givens' impairments did not meet or equal the severity of the listed impairments.  (R. 13.)  ALJ Axelsen's conclusion that Givens did not have a listed impairment is supported  by substantial evidence.  Sections 2.02 - 2.04 outline the conditions required to establish a visual impairment.  20 C.F.R., Pt. 404, Subpt. P, App. 1, § 2.02-2.04.

To constitute an Appendix 1 listed impairment, Givens must suffer from a "[l]oss of central visual acuity," characterized by "[r]emaining vision in the better eye after best correction [being] 20/200 or less."  20 C.F.R., Pt. 404, Subpt. P, App. 1, § 2.02.[15]   Although Givens is blind in his left eye, his medical records indicate that his best corrected vision  in the right eye ranges from

---

[15]    Impairment can also arise from "[c]ontraction of the visual field in the better eye."  20 C.F.R., Pt. 404, Subpt. P, App. 1, § 2.03. Last,  impairment can arise from "[l]oss of visual efficiency, or visual impairment, in the better eye." 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 2.04.  Givens' vision does not satisfy the requirements of either of these listings.

20/40 to 20/25.  (<u>See</u> pages 8-9 above.)   Thus, Givens' impairment in his right eye does not meet or medically equal the listing requirements.

Before proceeding to step four, the Court will address ALJ Axelsen's credibility and residual functional capacity determinations.

### 1.    Credibility Determination

Because subjective symptoms like pain only lessen a claimant's residual functional capacity ("RFC") where the symptoms "'can reasonably be accepted as consistent with the objective medical evidence and other evidence,' the ALJ is not required to accept allegations regarding the extent of symptoms that are inconsistent with the claimant's statements or similar evidence." <u>Moulding</u> v. <u>Astrue</u>, 08 Civ. 9824, 2009 WL 3241397 at *7 (S.D.N.Y. Oct. 8, 2009) (citation & emphasis omitted); <u>see</u>, <u>e.g.</u>, <u>Campbell</u> v. <u>Astrue</u>, 465 F. App'x 4, 7 (2d Cir. 2012) ("As for the ALJ's credibility determination, while an ALJ 'is required to take the claimant's reports of pain and other limitations into account,' he or she is 'not require[d] to accept the claimant's subjective complaints without question.'  Rather, the ALJ 'may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record.'" (citations omitted)); <u>Genier</u> v. <u>Astrue</u>, 606 F.3d 46, 49 (2d Cir. 2010) ("When determining a claimant's RFC, the ALJ is required to take the claimant's reports of pain and other limitations into account, but is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." (citations omitted)); <u>Brown</u> v. <u>Comm'r of Soc. Sec.</u>, 310 F. App'x 450, 451 (2d Cir. 2009) ("Where there is conflicting evidence about a claimant's pain, the ALJ must make credibility findings.").[16]   In

---

[16]    See also, <u>e.g.</u>, <u>Rivers</u> v. <u>Astrue</u>, 280 F. App'x 20, 22 (2d Cir. 2008) (same); <u>Thompson</u> v.
(continued...)

addition, "courts must show special deference to an ALJ's credibility determinations because the ALJ had the opportunity to observe plaintiff's demeanor while [the plaintiff was] testifying." Marquez v. Colvin, 12 Civ. 6819, 2013 WL 5568718 at *7 (S.D.N.Y. Oct. 9, 2013).[17]

ALJ Axelsen considered Givens' "symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence," and determined that Givens' "medically determinable impairment could reasonably be expected to cause the alleged symptoms; however, [Givens'] statements concerning the intensity, persistence and

---

[16]   (...continued)
Barnhart, 75 F. App'x 842, 845 (2d Cir. 2003) (The ALJ properly found that plaintiff's "description of her symptoms was at odds with her treatment history, her medication regime and her daily routine."); Snell v. Apfel, 177 F.3d 128, 135 (2d Cir. 1999); Norman v. Astrue, 912 F. Supp. 2d 33, 85 (S.D.N.Y. 2012) ("It is 'within the discretion of the [Commissioner] to evaluate the credibility of plaintiff's complaints and render an independent judgment in light of the medical findings and other evidence regarding the true extent of such symptomatology.'"); Astolos v. Astrue, No. 06-CV-678, 2009 WL 3333234 at *12 (W.D.N.Y. Oct. 14, 2009) (The ALJ properly determined that plaintiff's subjective pain complaints were not supported by the medical record.); Speruggia v. Astrue, No. 05-CV-3532, 2008 WL 818004 at *11 (E.D.N.Y. Mar. 26, 2008) ("The ALJ 'does not have to accept plaintiff's subjective testimony about her symptoms without question' and should determine a plaintiff's credibility 'in light of all the evidence.'"); Soto v. Barnhart, 01 Civ. 7905, 2002 WL 31729500 at *6 (S.D.N.Y. Dec. 4, 2002) ("The ALJ has the capacity and the discretion to evaluate the credibility of a claimant and to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of pain alleged by the claimant."); Brandon v. Bowen, 666 F. Supp. 604, 608 (S.D.N.Y. 1987) (same).

[17]   Accord, e.g., Campbell v. Astrue, 465 F. App'x at 7 ("[W]e have long held that '[i]t is the function of the [Commissioner], not ourselves, . . . to appraise the credibility of witnesses, including the claimant.'"); Nunez v. Astrue, 11 Civ. 8711, 2013 WL 3753421 at *7 (S.D.N.Y. July 17, 2013); Guzman v. Astrue, 09 Civ. 3928, 2011 WL 666194 at *7 (S.D.N.Y. Feb. 4, 2011); Ruiz v. Barnhart, 03 Civ. 10128, 2006 WL 1273832 at *7 (S.D.N.Y. May 10, 2006); Gernavage v. Shalala, 882 F. Supp. 1413, 1419 & n.6 (S.D.N.Y. 1995); Mejias v. Soc. Sec. Admin., 445 F. Supp. 741, 744 (S.D.N.Y. 1978) (Weinfeld, D.J.); Wrennick v. Sec'y of Health, Educ. & Welfare, 441 F. Supp. 482, 485 (S.D.N.Y. 1977) (Weinfeld D.J.).

limiting effects of these symptoms are not credible to the extent they are inconsistent with the

[ALJ's] residual functional capacity assessment."  (R. 14.)[18/]

When ruling that a claimant is not entirely credible, the ALJ must provide "specific

reasons for the finding on credibility, supported by the evidence in the case record."  SSR 96-7p,

1996 WL 374186 at *4 (July 2, 1996).  The regulations set out a two-step process for assessing a

claimant's statements about pain and other limitations:

> At the first step, the ALJ must decide whether the claimant suffers from a medically
> determinable impairment that could reasonably be expected to produce the symptoms
> alleged.... If the claimant does suffer from such an impairment, at the second step,
> the ALJ must consider the extent to which the claimant's symptoms can reasonably
> be accepted as consistent with the objective medical evidence and other evidence of
> record. The ALJ must consider statements the claimant or others make about his
> impairments, his restrictions, his daily activities, his efforts to work, or any other
> relevant statements he makes to medical sources during the course of examination
> or treatment, or to the agency during interviews, on applications, in letters, and in
> testimony in its administrative proceedings.

Genier v. Astrue, 606 F.3d at 49 (quotations, citations & brackets omitted).[19/]

---

[18/]   This Court, and others, previously have criticized ALJ decisions that "[d]etermin[e] the RFC
first and then measur[e] the claimant's credibility by that yardstick," as "illogical" and
"prejudicial to the claimant."  Cruz v. Colvin, 12 Civ. 7346, 2013 WL 3333040 at *15-16
(S.D.N.Y. July 2, 2013) (Peck, M.J.) (& cases cited therein), report & rec. adopted, 2014 WL
774966 (S.D.N.Y. Feb. 21, 2014).  Nevertheless, while ALJ Axelsen's language leaves
something to be desired, here unlike in Cruz, he gave sufficient explanation for finding
Givens' claim of disabling right eye pain to lack credibility – including careful review of the
contrary medical evidence and Givens' candid admissions that he felt he deserved Social
Security benefits because he had worked for twenty plus years – that the Court concludes
the ALJ's finding is supported by substantial evidence and a remand is not called for.

[19/]   Accord, e.g., Cichocki v. Astrue, 534 F. App'x 71, 75-76 (2d Cir. 2013); Campbell v. Astrue,
465 F. App'x at 7; Meadors v. Astrue, 370 F. App'x 179, 183 (2d Cir. 2010); Taylor v.
Barnhart, 83 F. App'x 347, 350-51 (2d Cir. 2003); 20 C.F.R. § 416.945(a)(1), (3); SSR 96-
7p, 1996 WL 374186 at *2.

ALJ Axelsen properly applied this two-step process to Givens' case.  (R. 13-14.) First, ALJ Axelsen assessed Givens' credibility by considering all of the relevant medical evidence in the record.  (R. 14.)  Specifically, the ALJ found that the record reflected that Givens "might have some consequent right eye strain, but there is not sufficient medical [evidence] to show he would require related extensive work breaks during the workday."  (R. 14.)

Second, ALJ Axelsen noted that Givens emphasized at both hearings that he worked his whole life and felt it was time for him to "sit back and relax, and collect some time in Social Security."  (See page 10 above.)  The Court finds that Givens' belief that his years of work render him deserving of Social Security benefits decreases  the credibility of his claims of alleged right eye pain.  Moreover, although ALJ Axelsen left the record open after the November 16, 2011 hearing to allow Givens to seek additional medical evidence about his headaches (see page 4 above), Givens provided only Lenox Hill's September 2011 records, which document no complaints of headaches or dizziness, and indicate minimal objective findings and treatment for his alleged right eye pain.  (See pages 7-8 above.)  Notably, on Givens' September 24, 2011 visit to Lenox Hill, he stated  that he needed a medical report for a law suit.  (See page 8 above.)  During both the June 15, 2011 and November 16, 2011 ALJ hearings, Givens admitted that his only ongoing medical treatment was Tramadol and eye drops.  (See page 4 above.)  He also admitted that he was capable of performing many day-to-day activities, such as reading, watching television, caring for his personal needs, using public transportation, and going to church.  (R. 25, 31-32, 44-46, 166-69, 170, 269).

Thus, ALJ Axelsen met his burden in finding Givens' claims not entirely credible because Givens disclosed  that after working for over twenty-four years, he thought he was entitled to collect Social Security, and the objective medical evidence failed to support his claims of disability based on his right eye pain or headaches.  See, e.g., Verdaguer v. Colvin, 12 Civ. 6858,

2013 WL 6426931 at *3, *10 (S.D.N.Y. Dec. 9, 2013) (where claimant had "'a permanent partial visual disability as a result of blindness in his left eye'" and normal vision in his right eye, the "ALJ began his credibility analysis by correctly noting that there was no evidence that Plaintiff ever complained to any doctor at New York Eye and Ear Infirmary of headaches, pain, dizziness or vertigo"); Hilliard v. Colvin, 13 Civ. 1942, 2013 WL 5863546 at *15 (S.D.N.Y. Oct. 31, 2013) (Peck, M.J.) (The "ALJ . . . met his burden in finding [plaintiff's] claims not entirely credible because she remains functional in terms of activities of daily living and the objective medical evidence fails to support her claims of total disability based on pain." (citations omitted)); Miller v. Colvin, No. 12-cv-375, 2013 WL 1760856 at *3, *5 (N.D.N.Y. Apr. 24, 2013) (where claimant suffers from a visual impairment but remained able to avoid ordinary hazards in the workplace, read ordinary print, take care of his personal hygiene and watch television, the ALJ's determination that the claimant's subjective complaints were not fully credible is supported by substantial evidence); Johnston v. Astrue, No. CV-07-5089, 2008 WL 4224059 at *11 (E.D.N.Y. Sept. 8, 2008) (where the "objective medical evidence in the record with respect to plaintiff's [loss of vision in the left eye and cataract in the right eye] fails to reveal why and how this impairment would preclude plaintiff from engaging in all work activity existing in the national economy . . . , the ALJ's determination that plaintiff's eye impairment does not significantly diminish his ability to perform light work and her subsequent application of the Grids to find plaintiff 'not disabled' was supported by substantial evidence"); see also, e.g., Stanton v. Astrue, 370 F. App'x 231, 234 (2d Cir. 2010) (the court will not "second-guess the credibility finding . . . where the ALJ identified specific record-based reasons for his ruling"); Rutkowski v. Astrue, 368 F. App'x 226, 230 (2d Cir. 2010) (ALJ adequately supported credibility finding when he noted that "substantial evidence existed showing that [plaintiff] was relatively 'mobile and functional,' and that [plaintiff's] allegations of disability contradicted the

broader evidence"); <u>Ashby</u> v. <u>Astrue</u>, 11 Civ. 2010, 2012 WL 2477595 at *15 (S.D.N.Y. Mar. 27, 2012) ("in making his credibility assessment, the ALJ appropriately considered Plaintiff's ability to engage in certain daily activities as one factor, among others suggested by the regulations"), <u>report & rec. adopted</u>, 2012 WL 2367034 (S.D.N.Y. June 20, 2012).

### 2.   Residual Functional Capacity Determination

ALJ Axelsen determined that Givens retained "the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except [he] cannot perform work requiring the use of sight in more than one eye." (R. 13.)  Specifically, ALJ Axelsen concluded that Givens is able to perform a range of light work, based on the vocational expert's testimony. (R. 13.)  The Court finds ALJ Axelsen's assessment that Givens is able to perform light work that does not require the use of sight in more than one eye was based on substantial evidence.

### D.   Givens Did Not Have The Ability To Perform His Past Work

The fourth step of the five-step analysis asks whether Givens had the residual functional capacity to perform his past relevant work. (<u>See</u> page 15 above.)  Because the vocational expert testified that Givens "could not perform his past relevant work with [his] residual functional capacity," ALJ Axelsen concluded that Givens was "unable to perform any past relevant work." (R. 14.)  Because this finding favors Givens, the Court proceeds to the fifth and final step of the analysis.

### E.   There Was Sufficient Evidence To Support The ALJ's Finding That Givens Could Perform "Light" Work In The Economy, Except For Work Requiring The Use Of Sight In More Than One Eye

In the fifth step, the burden shifts to the Commissioner, "who must produce evidence to show the existence of alternative substantial gainful work which exists in the national economy and which the claimant could perform, considering not only his physical capability, but as well his

age, his education, his experience and his training."  Parker v. Harris, 626 F.2d 225, 231 (2d Cir. 1980).[20]

> In meeting his burden under the fifth step, the Commissioner:
>
> may rely on the medical-vocational guidelines contained in 20 C.F.R. Part 404, Subpart P, App. 2, commonly referred to as "the Grid."  The Grid takes into account the claimant's residual functional capacity in conjunction with the claimant's age, education and work experience.  Based on these factors, the Grid indicates whether the claimant can engage in any other substantial gainful work which exists in the national economy.  Generally the result listed in the Grid is dispositive on the issue of disability.

Zorilla v. Chater, 915 F. Supp. 662, 667 (S.D.N.Y. 1996) (fn. omitted); see, e.g., Heckler v. Campbell, 461 U.S. 458, 461-62, 465-68, 103 S. Ct. 1952, 1954-55, 1956-58 (1983) (upholding the promulgation of the Grid); Roma v. Astrue, 468 F. App'x at 20-21; Martin v. Astrue, 337 F. App'x 87, 90 (2d Cir. 2009); Rosa v. Callahan, 168 F.3d at 78; Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996); Bapp v. Bowen, 802 F.2d 601, 604 (2d Cir. 1986).  "The Grid classifies work into five categories based on the exertional requirements of the different jobs.  Specifically, it divides work into sedentary, light, medium, heavy and very heavy, based on the extent of requirements in the primary strength activities of sitting, standing, walking, lifting, carrying, pushing, and pulling." Zorilla v. Chater, 915 F. Supp. at 667 n.2; see 20 C.F.R. § 404.1567.  Taking account of the claimant's residual functional capacity, age, education, and prior work experience, the Grid yields a decision of "disabled" or "not disabled."  20 C.F.R. § 404.1569; 20 C.F.R., Pt. 404, Subpt. P, App. 2, § 200.00(a).

---

[20]   See, e.g., Roma v. Astrue, 468 F. App'x 16, 20 (2d Cir. 2012); Arruda v. Comm'r of Soc. Sec., 363 F. App'x 93, 95 (2d Cir. 2010); Butts v. Barnhart, 388 F.3d 377, 381 (2d Cir. 2004), amended on other grounds, 416 F.3d 101 (2d Cir. 2005); Curry v. Apfel, 209 F.3d 117, 122-23 (2d Cir. 2000); Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999).

However, "relying solely on the Grids is inappropriate when nonexertional limitations 'significantly diminish' plaintiff's ability to work so that the Grids do not particularly address plaintiff's limitations."  Vargas v. Astrue, 10 Civ. 6306, 2011 WL 2946371 at *13 (S.D.N.Y. July 20, 2011); see also, e.g., Travers v. Astrue, 10 Civ. 8228, 2011 WL 5314402 at *10 (S.D.N.Y. Nov. 2, 2011) (Peck, M.J.), report & rec. adopted, 2013 WL 1955686 (S.D.N.Y. May 13, 2013); Lomax v. Comm'r of Soc. Sec., No. 09-CV-1451, 2011 WL 2359360 at *3 (E.D.N.Y. June 6, 2011) ("Sole reliance on the grids is inappropriate, however, where a claimant's nonexertional impairments 'significantly limit the range of work permitted by his exertional limitations.'").

Rather, where the claimant's nonexertional limitations "'significantly limit the range of work permitted by his exertional limitations,' the ALJ is required to consult with a vocational expert."  Zabala v. Astrue, 595 F.3d 402, 410 (2d Cir. 2010) (quoting Bapp v. Bowen, 802 F.2d at 605); see also, e.g., Selian v. Astrue, 708 F.3d 409, 421 (2d Cir. 2013) ("We have explained that the ALJ cannot rely on the Grids if a non-exertional impairment has any more than a 'negligible' impact on a claimant's ability to perform the full range of work, and instead must obtain the testimony of a vocational expert."); Rosa v. Callahan, 168 F.3d at 82 ("Where significant nonexertional impairments are present at the fifth step in the disability analysis, however, 'application of the grids is inappropriate.'  Instead, the Commissioner 'must introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain and perform.'" (quoting & citing Bapp)); Suarez v. Comm'r of Soc. Sec., No. 09-CV-338, 2010 WL 3322536 at *9 (E.D.N.Y. Aug. 20, 2010) ("If a claimant has nonexertional limitations that 'significantly limit the range of work permitted by his exertional limitations,' the ALJ is required to consult with a vocational expert." (quoting Zabala)).

ALJ Axelsen determined that Givens' "ability to perform all or substantially all of the requirements of [the unskilled light] work has been impeded by additional limitations," specifically his "total loss of vision in his left eye and 20/40 vision in the right eye." (R. 14, 15.) ALJ Axelsen elicited testimony from a vocational expert instead of simply relying on the Grid. (See page 11 above.) Specifically, ALJ Axelsen "asked the vocational expert whether jobs exist in the national economy for an individual with [Givens'] age, education, work experience, and residual functional capacity." (R. 15, 27-30.) The vocational expert testified that there were hand packager, garment sorter, sorter and stuffer jobs readily available in the national and local economy that a hypothetical individual with Givens' age, education, past work experience and residual functional capacity, including blindness in the left eye and 20/30 vision in the right eye, could perform. (See pages 8-9 above.)[21]

---

[21]    A vocational expert can provide evidence regarding the existence of jobs in the economy and a particular claimant's functional ability to perform any of those jobs.  20 C.F.R. §§ 404.1566(e), 416.966(e); see, e.g., Calabrese v. Astrue, 358 F. App'x 274, 275-76 (2d Cir. 2009); Butts v. Barnhart, 416 F.3d at 103-04; Taylor v. Barnhart, 83 F. App'x 347, 350 (2d Cir. 2003); Jordan v. Barnhart, 29 F. App'x 790, 794 (2d Cir. 2002); Rautio v. Bowen, 862 F.2d 176, 180 (8th Cir. 1988); Dumas v. Schweiker, 712 F. 2d 1545, 1553-54 (2d Cir. 1983); DeJesus v. Astrue, 762 F. Supp. 2d 673, 693 n.20 (S.D.N.Y. 2011) (Peck, M.J.); Quezada v. Barnhart, 06 Civ. 2870, 2007 WL 1723615 at *13 n.20 (S.D.N.Y. June 15, 2007) (Peck, M.J.); Snipe v. Barnhart, 05 Civ. 10472, 2006 WL 2390277 at *18 (S.D.N.Y. Aug. 21, 2006) (Peck, M.J.), report & rec. adopted, 2006 WL 2621093 (S.D.N.Y. Sept. 12, 2006); de Roman v. Barnhart, 03 Civ. 0075, 2003 WL 21511160 at *17 (S.D.N.Y. July 2, 2003) (Peck, M.J.); Bosmond v. Apfel, 97 Civ. 4109, 1998 WL 851508 at *8 (S.D.N.Y. Dec. 8, 1998); Fuller v. Shalala, 898 F. Supp. 212, 218 (S.D.N.Y. 1995) (The "vocational expert, . . . provided several examples of unskilled . . . jobs that are available in the national and local economies for a person with [plaintiff's] condition, age, education, and work experience. . . . Accordingly, the Secretary satisfied her burden of showing that such jobs exist in the national economy.").

## **CONCLUSION**

For the reasons discussed above, the Commissioner's motion for judgment on the pleadings (Dkt. No. 15) should be <u>GRANTED</u>.

### FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections.  See also Fed. R. Civ. P. 6.  Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Valerie E. Caproni, 40 Foley Square, Room 240, and to my chambers, 500 Pearl Street, Room 1370. Any requests for an extension of time for filing objections must be directed to Judge Caproni (with a courtesy copy to my chambers).  Failure to file objections will result in a waiver of those objections for purposes of appeal.  Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466 (1985); Ingram v. Herrick, 475 F. App'x 793, 793 (2d Cir. 2012); IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1054 (2d Cir. 1993), cert. denied, 513 U.S. 822, 115 S. Ct. 86 (1994); Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir. 1992), cert. denied, 506 U.S. 1038, 113 S. Ct. 825 (1992); Small v. Sec'y of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989); Wesolek v. Canadair Ltd., 838 F.2d 55, 57-59 (2d Cir. 1988); McCarthy v. Manson, 714 F.2d 234, 237-38 (2d Cir. 1983).

Dated:          New York, New York
                April 14, 2014

Respectfully submitted,

_____
**Andrew J. Peck**
United States Magistrate Judge

Copies ECF to:  Freddy Givens (Mail)
                Elizabeth Rothstein, Esq.
                Judge Valerie E. Caproni